# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 06 CR 964 |
| | ) | |
| MICHAEL E. KELLY, | ) | Magistrate Judge Morton Denlow |
| | ) | |
| Defendant. | ) | |

TO: THE HONORABLE RONALD A. GUZMAN
UNITED STATES DISTRICT JUDGE

## REPORT AND RECOMMENDATION

On October 18, 2011, the parties and the Special Master appeared before this Court for a report and discussion concerning certain legal issues affecting restitution. In addition, an attorney for Provident Trust Group, LLC, appeared on its motion for an order directing the Special Master to make restitution payments directly to Provident for victims whose IRA accounts are owned by Provident as custodian. Dkt. 772. During the hearing, the Court indicated its preliminary opinions on the issues set forth below but no final decisions were made. Instead, the Court set a hearing on December 1, 2011, at 10:30 a.m., to finally resolve these legal issues and directed that the victims be made aware of the legal issues so that they could have an opportunity to submit comments.

On November 7, 2011, the government informed victims of the legal issues then pending before this Court as well at the Court's preliminary opinions, and advised victims of the opportunity to submit comments to the Court. A number of victims submitted

comments, most to the government and some directly to the Court. On November 28, 2011, the government filed a compilation of the comments it had received. Dkt. 836.[1]

On December 1, 2011, the parties and Provident appeared before the Court. At that time, the Court heard further discussion of the various issues, was advised by the Special Master of various business matters, facts, and circumstances relating to his responsibilities in administering the assets in the Restitution Trust, and considered the views expressed by victims and others.

After review of all written submissions and the points and facts raised at the hearings, the Court recommends as follows:

1. **Starting Point for Basic Loss Calculation**. The starting point for calculating the restitution should be the value of the actual loss suffered by the victim, *i.e.* the total amount of money paid by a victim to obtain a universal lease. The amount of money a victim paid in penalties for withdrawing money (*e.g*, from an IRA) to buy a universal lease should be included as "loss" to the extent it can be efficiently determined.

2. **Reduction for Value Returned to a Victim.** In calculating the "loss amount," pursuant to the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3664(f)(1)(A), the amount to be paid to a victim must be reduced by any amount of property or value that was "returned" to the victim. In this case, the "value returned" to a victim includes all amounts

---

[1] On December 8, 2011, the government filed a second compilation of victim comments that had been received after November 28. Dkt. 849.

actually paid to a victim as "interest" or "rental fees," as well as any money paid by the defendant to repurchase a lease (to the extent actually received).

For the reasons set out below, the Court recommends that the Special Master be granted authority to terminate or renegotiate the terms of as yet uncompleted purchase agreements for twenty-five condominiums that were to be purchased by victims in whole or in part by the "roll over" of the value of their universal leases. For those victim leaseholders whose condominium unit purchase agreement are terminated or modified, their loss will be calculated as described above, and the value of any interest in the condominium purchase agreement will not be regarded as "value returned." These victims will participate *pro rata* in the overall Restitution Trust as any other victim.

The Court is advised that twenty-three universal lease victims "rolled over" the value of the lease toward the purchase price of a total of twenty-five units in a condominium project called *Bella Vista*, which was undertaken by defendant Kelly under the corporate name, *Panorama Communities, S.A. de C.V.* This project, situated adjacent to the *Puerto Cancun* development in Cancun, is now an asset of the Restitution Trust and under the ultimate control of the Special Master.

Though the details may have varied some, the essence of these "roll overs" was that Kelly (acting though family members and certain employees) resolved complaints of certain universal leaseholders by an agreement whereby the value of each lease was "rolled over" as a credit toward the purchase of a *Bella Vista* condominium unit. Kelly issued a check (representing the negotiated value of a lease) made payable to the leaseholder, who then

signed the back of the check attempting to endorse the check and apply the funds towards a unit at *Bella Vista*. However, the Special Master's Mexican counsel advise that such endorsement was not validly done under Mexican law. Those checks were never negotiated and remain in envelopes in Cancun. The price of the condominium units offered to victims who "rolled over" their universal lease investment was at or near the list price, in short, at a reasonable market value. The total sales price value of the twenty-five units is $3,360,845.

The value of eleven of the leases "rolled over" was equal to the purchase price and leaseholders were not required to pay any additional money. Fourteen of the leases were not equal to the purchase price and the leaseholders have paid all additional funds to meet the purchase price. Because the condominium regime required by Mexican law is not yet final, no deed has been delivered to any purchaser. No universal lease victim who rolled over into a Bella Vista condominium unit has received title, taken possession, or taken up residence there.

After consultation with Mexican and Panamanian counsel, the Special Master advises that the purchase contracts or agreements entered into by those victims who agreed to "roll over" their universal lease toward a *Bella Vista* condominium unit as described above are subject to termination under Mexican law. This is due principally to the above-described "endorsed check" method of payment, which is insufficient under the laws of Mexico.

The Court believes, and so recommends, that the Restitution Trust will be enhanced if the Special Master has the authority and flexibility to either terminate these purchase agreements or negotiate the resolution of those purchase agreements where the victim paid

4

cash in addition to the value of the "rolled over" lease. In some instances, the leaseholder may choose to complete the transaction by paying cash as substitute for the value of the "rolled over" lease, thus paying the entire purchase price of the unit with additional funds. In other circumstances, the Special Master may negotiate the cancellation of the transaction with an agreed-upon schedule for return of the cash already paid.

In all cases where the purchase agreement is terminated, the units would then be available for sale by the Special Master to cash purchasers and the proceeds would be used to increase restitution to the victims.

3. **Pre-judgment Interest**. Although a district court has authority to order pre-judgment interest, the circumstances of this case militate against doing so. Given the amount of money that the Special Master seems likely to recover, this Court does not deem it in the best interests of the victims as a whole to calculate pre-judgment interest unless and until all victims are made whole (as described above) through restitution payments.

4. **Deceased Victim-Investor Restitution Payments.** The Court further recommends that the Special Master should use his best efforts to determine each deceased victim's legal heir rather than relying on the beneficiary designations contained in the universal lease. This course is a more streamlined and less expensive procedure. Individuals who claim to be the legal heir to a victim, but who are denied such status by the Special Master, would have recourse to this Court to resolve the issue.

5. **Broker Restitution Eligibility**. In this case, Kelly used a number of brokers - large and small - to market the universal lease program. Brokers earned commissions, some

5

as high as eighteen percent, and some received commission in the form of a universal lease. The Court recommends that unless a broker can show that he or she used funds unrelated to universal lease commissions to purchase a universal lease, the broker's claim for restitution should be subordinated to the other victims' claims. The burden of proof should be on the brokers.

6. **Provident Motion to Receive Payments.** As noted above, Provident Trust Group, LLC (Provident) asked the court to direct the Special Master to make certain restitution payments directly to Provident. After reviewing victim comments on the issue, almost unanimously against Provident's proposal, the Court recommends that the Special Master should pay victims (or their appropriate representative) directly unless a victim specifically designates otherwise.

## IV. CONCLUSION

**For the foregoing reasons, this Court recommends as follows: the starting point for calculating restitution should be the actual loss suffered by a victim and should not include withdrawal penalties; a victim's loss amount should be reduced by any "value returned" and the Special Master should have discretion to terminate purchase agreements which used "roll-over" leases; pre-judgment interest should not be included in loss calculation; the Special Master should use his best efforts to determine deceased victim's legal heirs; claims of brokers for restitution should be subordinate to other victims; and restitution payments should be made directly to victims, rather than Provident Trust Group unless a victim directs otherwise.**

Respectfully submitted,

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Date: December 21, 2011**

Any objections to the Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this notice. Failure to file objections within the specified time waives the right to object to or appeal the Magistrate Judge's Report and Recommendation.